UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In Re:<br><br>KATHLEEN L. BROWN,<br><br>Debtor. | Chapter 7<br>Case No. 15-20067 |
| KATHLEEN L. BROWN,<br><br>Plaintiff,<br><br>v.<br><br>NORTHSTAR EDUCATION FINANCE, INC. and EDUCATION CREDIT MANAGEMENT CORPORATION,<br><br>Defendants. | Adversary Proceeding<br>Case No. 15-02003 |

## MEMORANDUM OF DECISION

Kathleen L. Brown (the "Plaintiff") filed a complaint under 11 U.S.C. § 523(a)(8)[1] seeking to discharge certain student loan debt she incurred in connection with her law school education and which is currently held and/or serviced by Education Credit Management Corporation ("ECMC").[2] An evidentiary hearing took place on September 23, 2016, during which the Plaintiff was the sole witness. The Plaintiff and ECMC filed post-hearing briefs on October 14, 2016 and October 21, 2016, respectively, and the matter was taken under

---

[1] References to statutory section numbers are to the Bankruptcy Reform Act of 1978, as amended, (the "Code"), 11 U.S.C. §101 et seq.

[2] The Plaintiff originally named four defendants: Northstar Education Finance, Inc. ("Northstar"), Total Higher Education, Great Lakes Higher Education Guaranty Corp. and the United States Department of Education. (Docket Entry ("DE") 1). ECMC was subsequently substituted for Great Lakes Higher Education Guaranty Corp. (DE 14). The United States Department of Education and Total Higher Education were dismissed. (DEs 27, 30, 44 and 53). A consent judgment entered against Northstar on September 23, 2016, pursuant to which Northstar stipulated to the nondischargeability of six student loans under section 523(a)(8). (DE 70). The sole remaining defendant is ECMC.

1

advisement. Upon review of the papers filed by the parties, and for the reasons set forth below, JUDGMENT is hereby entered against the Plaintiff and in favor of ECMC.

## I. Jurisdiction and Venue.

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334 and the United States District Court for the District of Maine Local Rule 83.6(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue here is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Background.

The Plaintiff incurred the school loans which are the subject of this proceeding in connection with her studies at the California Western School of Law. She enrolled in law school in January of 2001, at the age of forty-four, and received her Juris Doctor in May of 2005. Instead of sitting for the bar exam immediately, the Plaintiff took a series of accounting jobs to support herself financially.[3] After being laid off from an accounting job in 2008, she sat for, and passed, the California bar at the age of fifty-one. Soon after being sworn in, and with the hope of gaining legal experience, she accepted a pro bono position with a non-profit organization.

The Plaintiff's testimony regarding her employment prospects at the non-profit organization is inconsistent. On the one hand, she testified that she ceased working for the organization after six months because it became apparent the organization would never hire her due to her age. In support of this claim, the Plaintiff testified that the organization hired a younger male attorney during that same six-month period; clearly implying she was passed over for the paid position. On the other hand, the Plaintiff testified that new-hires were expected to work one year without pay before being hired for paid positions and acknowledged that the co-

---

[3] The Debtor left law school in October of 2001 and returned to Kennebunkport, Maine where she owned a home and worked part-time in seasonal jobs before returning to California to resume her legal studies in August of 2002.

worker hired ahead of her satisfied that requirement. The non-profit organization called her at least once after she left the organization's employment but the Plaintiff stated that she did not resume her volunteer work because she would never be offered a paid position.

After leaving the non-profit organization in or around May of 2009, the Plaintiff resumed her search for paying legal work, which efforts included applying to openings for contract attorneys. Although she received invitations to a number of first-round interviews, the Plaintiff alleges that prospective employers told her during those interviews that she was too old and would never find employment as an attorney in California.

In August of 2009, the Plaintiff was struck by a motor vehicle while attempting to cross an intersection in the cross-walk and sustained a number of injuries, including broken bones. In her joint pretrial memorandum, the Plaintiff attributed a number of chronic medical issues to the accident, including debilitating neuralgia and neuropathic-type pain throughout her body.

In May of 2010, the Plaintiff returned to Maine where she attempted to find legal work after being sworn into the Maine bar. Although the Plaintiff testified that her search for paying work as an attorney in Maine was just as disappointing as her California search, the extent of her efforts is unclear. The Plaintiff described just one interview with a potential employer she claimed was never serious about hiring her.

In June of 2010, the Plaintiff attempted to open her own practice. She rented commercial space in Kennebunk from a family friend for $200 per month, but testified that she was retained by a single client and ultimately closed her office in July of 2011. Despite being pressed by ECMC's counsel, the Plaintiff did not provide clear testimony regarding her efforts to establish her practice. Instead, she compared herself unfavorably to a law school classmate with a

3

successful solo practice who took different classes in law school and possesses a bolder personality. The Plaintiff has not sought legal employment since closing her office.

In 2011, the Plaintiff accepted a $10-per-hour, part-time position with the Catholic Charities of Maine. That same year, at the age of 55, and inspired by her step-brother who earned significant income in the nursing profession, the Plaintiff began nursing school. The Plaintiff testified that she did not know how physically draining the nursing profession would be and ultimately acknowledged that her step-brother's financial success was tied to his long working hours and status as a senior registered nurse.

The Plaintiff asserts that she was hampered during nursing school by chronic pain, fatigue and mobility issues stemming from her 2009 accident, as well as a neck injury which first appeared in 2005 and recurred again in or around 2011. When she graduated from nursing school in 2013, she was largely confined to her bed for the next several months due to an illness. During that period, she continued working for Catholic Charities of Maine for approximately 15 hours per week, but was unable to take the registered nurse licensing exam until November of 2014.

In December 2014, the Plaintiff found employment as a per diem registered nurse at Durgin Pines in Kittery, Maine where she earned $26 per hour and worked 25-30 hours per week. The Plaintiff testified that she currently suffers severe joint pain. Walking bothers her ankle and right hip; both of which were apparently injured in the 2009 accident. Lingering mobility issues in her ankle cause her to fall frequently. The Plaintiff further testified that she continues to suffer from a degenerative condition in her neck resulting in nearly unbearable pain. She, at times during her nursing career, experienced a "flopping" or "dropping" sensation in her right leg although this condition resolved itself by the end of 2015.

The Plaintiff eventually left her job at Durgin Pines to accept a job at a staffing agency offering $20 per hour and a smaller compensation package with fewer incentives. Although she acknowledged that a nurse could do better financially if he or she were employed directly by a facility such as Durgin Pines, the Plaintiff testified that she has no interest in working for a facility because she was treated "pretty badly" at some of those places. She testified that the staffing agency offers a more supportive environment because the agency acts as a buffer between her and the facility.

In her current job, the Plaintiff is afforded more flexibility with respect to scheduling. While Durgin Pines required her to work a minimum number of hours per week, the staffing agency allows the Plaintiff to pick and choose which days, and the number of days, she prefers to work. She usually works two days per week but sometimes feels well enough to work three days. Some of the other nurses at the staffing agency work 40-60 hours per week and the staffing agency continuously requests that their nurses work more hours. The Plaintiff testified that she looked for less physically demanding jobs but, absent experience in a more intensive acute care hospital setting, she is unqualified for these positions. She is either unwilling or unable to gain that necessary experience.

The Plaintiff expressed an intention to take "early retirement" in order to leave the workforce, or, in other words, to start drawing on her social security benefits at the age of 62. If she were to work until she is 66, the Plaintiff would have monthly social security income of $1,174.00. At 62, her monthly social security income would drop to $791.00. In 2015, the Plaintiff's gross income of $32,530.50 barely covered her most basic living expenses, and she deferred many necessary and significant medical, dental and home repair and maintenance

5

expenses. At the time of trial, the Plaintiff projected her gross income for 2016 would be even lower.

The Plaintiff has appeared *pro se* throughout this adversary proceeding, as well as in her underlying chapter 7 case, which included a heated exemption battle with the chapter 7 trustee. With only occasional and minimal assistance from a former law school classmate, the Plaintiff has capably represented herself with well-researched and well-drafted pleadings and legal memoranda on a variety of issues, revealing an ability to understand, apply and communicate complex legal concepts and rules of procedure.[4]

### III.    Legal Standard.

A discharge under section 727 of the Bankruptcy Code does not discharge a student loan unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. §523(a)(8). The creditor bears the initial burden of establishing that the debt is the type excepted from discharge. Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 797 (1st Cir. B.A.P. 2010). Once this initial burden has been satisfied, the burden shifts to the debtor to prove undue hardship by a preponderance of the evidence. Id.

Courts have developed several tests for determining whether the debtor has established undue hardship. This Court employs what has become known as the "totality of the circumstances" test which requires a debtor to "prove by a preponderance of the evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances

---

[4] Evidence of the Plaintiff's capabilities and the quality of her work in this adversary proceeding includes her complaint (DE 1), the motions and applications to dismiss parties (DEs 24, 26 and 52), the joint pretrial memorandum (DE 36, especially pp. 5-11) and her post-trial brief (DE 73). Similarly, in the main bankruptcy case, her work on her schedules (DEs 2, 16, 17) and her successful opposition to the chapter 7 trustee's objection to her exemptions and his motion to compel (DEs 30, 31, 38, 38 and 39), evince legal sophistication and proficiency.

6

unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts." Bronsdon, 435 B.R. at 798.

ECMC urges this Court to adopt the test set forth in Brunner v. New York State Higher Educ. Servs. Corp. which requires the debtor to show "1) that the debtor cannot, based on current income and expenses, maintain a 'minimal' standard of living for himself or herself and his or her dependents if forced to repay the loans, 2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan, and 3) that the debtor has made good faith efforts to repay the loans." In re Brunner, 46 B.R. 752, 756 (S.D.N.Y. 1985), aff'd sub nom. Brunner v. New York State Higher Educ. Services Corp., 831 F.2d 395 (2d Cir. 1987). In the alternative, ECMC asks the Court to append a "good faith" component to the "totality of the circumstances" test. Both of these suggestions run counter to the First Circuit Bankruptcy Appellate Panel's conclusion that no textual foundation exists for the "good faith" requirement in the context of § 523(a)(8). Bronsdon, 435 B.R. at 800.

Nonetheless, that does not necessarily mean that a debtor acting in bad faith is entitled to a hardship discharge.

> Irrespective of the test, the decision of a bankruptcy court, whether the failure to discharge a student loan will cause undue hardship to the debtor and the dependents of the debtor under § 523(a)(8), rests on both the economic ability to repay and the existence of any disqualifying action(s). The party opposing the discharge of a student loan has the burden of presenting evidence of any disqualifying factor, such as bad faith. The debtor is not required under the statute to establish prepetition good faith in absence of a challenge. The debtor should not be obligated to prove a negative, that is, that he did not act in bad faith, and, consequently, acted in good faith.

Bronsdon, 435 B.R. at 801. In other words, a debtor is not required to establish that he or she acted in good faith, but if a party opposing discharge can establish bad faith, such bad faith may constitute a disqualifying factor.

7

## IV. Analysis.

The sole question before this Court is whether the Plaintiff established, by a preponderance of the evidence, that repayment of her two ECMC loans would create an undue hardship, such that the loans should be discharged. (DE 36 and audio recording of trial DE 69).[5] As noted above, she was the sole witness and on some issues, she testified convincingly. For example, there is no question that she has not enjoyed, and does not currently enjoy, sufficient income to repay any portion of her student loans while maintaining a minimal standard of living. Her gross income in 2015 was $32,530.50 and her average monthly income exceeded her reasonable monthly expenses—which did not include payments on her student loan debt—by just $87.12. Further, the Plaintiff established that she has deferred many necessary expenses relating to home maintenance, medical and dental services and automobile repairs or replacement. On her current employment trajectory, the Plaintiff simply cannot repay the ECMC loans without substantial, if not undue, hardship.

However, she failed to satisfy the burden imposed upon her by Congress under §523(a)(8) because her testimony was less credible with respect to her reasonably reliable future income. While the Plaintiff's age and physical limitations certainly pose challenges, her often conflicting testimony regarding her employment history suggests that the Plaintiff's most significant obstacle to gainful employment is not her age, gender or physical limitations but, rather, her unrealistic expectations that reasonable employment must be flexible, comfortable, enjoyable and lucrative.

---

[5] The parties stipulated at the commencement of the trial that the two ECMC loans which are the subject of this proceeding are subject to § 523(a)(8) and that the loans have current principal balances of $43,842.83 and $68,054.16. (DE 69).

As evidence of her inability to obtain reasonably reliable future income, the Plaintiff pointed to her prior efforts to find steady, paying employment. Nowhere in her papers or her testimony, however, did the Plaintiff establish the extent of those efforts, choosing instead to rely on generalized comments regarding attendance at some networking events and participation in an unknown number of first interviews. It is simply impossible to determine, based on the limited evidence presented by the Plaintiff, how many applications she submitted, the type of openings to which she applied, or the length of time she actively engaged in the job search.

The limited testimony the Plaintiff did provide with respect to her job search was, at times, contradictory, and at other times, overreaching. For instance, the Plaintiff's conflicting testimony regarding her employment opportunities at the California non-profit undermined her assertion that she terminated her employment there because she knew she would never be offered a paying position. Likewise, her extremely broad characterization of prospective employers in California and Maine as openly discriminatory toward older law school graduates strains credulity. It seems improbable that all of these prospective employers—employers engaged in the practice of law—would be so universally insensitive to the inherent risk of liability under applicable employment discrimination laws as to make explicit reference to the Plaintiff's age as a determinative factor in the hiring process.

The Plaintiff's decision to attend nursing school at the age of 55, while suffering from chronic pain, is puzzling. It seems unlikely that the same individual who successfully completed law school and has so capably represented herself in this Court lacked the ability to understand or appreciate the physicality of the nursing profession or properly attribute her step-brother's financial success to his status as a senior registered nurse working long hours. Further, it does not help the Plaintiff's case that she refuses to work directly for nursing homes or similar

9

facilities, notwithstanding her ability to qualify for these higher paying jobs, because she finds it more enjoyable to work for staffing agencies. In light of this testimony, her plan to take "early retirement" at age 62 deserves greater scrutiny.

The Plaintiff contends that chronic medical conditions severely limit her future employment options. She correctly states that this Court does not require expert medical testimony to establish the existence of a limiting medical condition. In this case, however, the Plaintiff's contradictory statements raise credibility issues and, therefore, some evidence beyond her own anecdotal testimony would have been helpful in establishing the limiting effect of her numerous medical ailments.

Based on this evidentiary record, the Plaintiff did not meet her burden to prove that she could not maintain a minimal standard of living while paying back the loans in question; in part, because she did not adequately explain her unsuccessful employment history to date. She presents as an intelligent, articulate person. Her legal writing and research abilities are more than adequate. She appears to have the skills and licensing necessary to obtain employment in two well-paying professions. If her inability to find reliable employment is premised upon a medical ailment, rampant age or gender discrimination, or a lack of qualifications, then the ECMC loans should be discharged. If, however, the Plaintiff's current employment situation is more indicative of an unwillingness to work regularly, a lack of effort in finding steady employment or a far too limited job search, then a hardship discharge is not appropriate. Regardless, the Plaintiff bears the burden of establishing by a preponderance of the evidence that her reasonably reliable future income justifies a hardship discharge and she has not met that burden.[6]

---

[6] ECMC argues that the Plaintiff's bad faith further precludes her from taking advantage of the hardship discharge exception. As evidence of the alleged bad faith, ECMC points to, among other things, the Plaintiff's decision to gift

## V. Conclusion.

For the foregoing reasons, judgment is entered against the Plaintiff and in favor ECMC with respect to the Plaintiff's claim for a hardship discharge under § 523(a)(8).[7]

Dated: February 24, 2017                    /s/ Peter G. Cary
                                            Judge Peter G. Cary
                                            United States Bankruptcy Court

---

to her daughter in or around May of 2009 a half-acre house lot she owned in Camden, Maine. Notwithstanding the fact that the "totality of the circumstances" test does not impose a "good faith" burden upon the Plaintiff, it is troubling that she transferred land in Camden, Maine to her daughter at a time when she was struggling to find employment as an attorney and after she had incurred obligations to ECMC.  Although the Plaintiff contends that difficult topography rendered the lot virtually unsellable, her daughter successfully overcame that challenge to build a house and the improved property is now assessed at $226,000.  This transfer, viewed in light of the Plaintiff's decision to enter nursing school at the age of 55 and while plagued by chronic medical ailments, as well as her decision to quit her better paying job at Durgin Pines in favor of a more comfortable position at a staffing agency, and her stated intention of "retiring" at 62, could be enough to constitute a disqualifying factor under §528(a)(8). Regardless, the issue need not be reached since the Plaintiff has not satisfied her burden under the Bronsdon test.

[7]   This may not be the end of the Plaintiff's options to address her student debt.  She may be eligible for favorable treatment under one of the income-driven repayment plans offered by the U.S. Department of Education, an option she was not required to avail herself of prior to this adversary proceeding and an option she has yet to pursue.

11